Cook v. Jones.

CASE 45—PETITION EQUITY—DECEMBER 15.

# Cook v. Jones.

APPEAL FROM JEFFERSON CIRCUIT COURT, LAW AND EQUITY DIVISION.

1. LEASE WITH OPTION TO RENEW—ASSIGNMENT.—Where a lease of real estate for the term of ten years with the privilege of renewing for five years contained a covenant upon the part of the lessee to sublet to certain persons who were in possession of different parts of the

Cook v. Jones.

premises under ground leases, which were about to expire, and the lessee subsequently assigned to another all his rights under the lease, the right to exercise the option of renewal passed to the assignee, and this assignee and the various persons to whom the lessee sublet for the full term in compliance with his covenant in the lease, who are also to be regarded as assignees, and not as mere subtenants, having upon the expiration of the term all made application for a renewal of the lease, the lessor had no right to refuse to allow any of them to renew, even though no one of them might have the right to insist upon a renewal.

2. SAME.—Even if it should be conceded that the assignees were not entiled to demand a renewal though they all made the application, they certainly could have required the original lessee to make such demand, and, having been prevented from doing so by the assurances of the landlord through his agent that he would renew, the landlord can not now take advantage of his own wrong and oust one of the tenants whose demand for a renewal he refused.

3. AUTHORITY OF LANDLORD'S AGENT.—An agent of the landlord having general control of his property, although he had no right to conclude the lease or execute the necessary writings, must be regarded as having authority to give assurances that the lease would be renewed, and the tenants had the right to rely upon such assurances.

4. THE DISTINCTION BETWEEN AN ASSIGNMENT AND A LEASE depends upon the quantity of interest that passes and not upon the extent of the premises transferred. When, therefore, the lessee of property for a term of years demises a part of it to another for the whole of his term, this is not an under-lease, but an assignment pro tanto.

MARC MUNDY FOR APPELLANT.

1. This lease must be construed altogether so as to reach the *intent* of the parties. When the conditions and provisions are considered there can be little doubt that both parties intended that the rights of the tenants owning improvements on Fourth street requiring the extension provided in the lease for their protection should be so protected, and the effort of the Coffin Company to destroy those rights by refusing to demand a renewal or extension of the lease is such an attempt at fraud as both law and equity must condemn; the more especially as the apprehensions of defendant were lulled to sleep by the assurances of the plaintiff's agent. (2 Wood on Landlord and Tenant, pp. 944, 947; Kelso v. Kelly, 1 Daly, 419; Taylor's Landlord and Tenant, sec. 108.)

2. The Coffin Company is not released by the under-letting and assignment of its option from its liability on the original lease. Therefore the landlord has nothing to complain of, and must keep his covenant of renewal or extension. (Farington v. Keimbal, 126 Mass., 314;

Cook v. Jones.

Greenleaf v. Allen, 127 Mass, 248; Aswald v. Feightenburg, 36 Minn , 270.)

3. The covenant of renewal passes by assignment. (Blakemore v. Boardman, 28 Mo., 420; McAdo v. Cullam, 86 N. C., 419.)

4. When the Coffin Company under-let to Godshaw its term of ten years, and transferred to him the option of renewal for five years, it parted with all its interest in this piece of land, and, therefore, its letting to Godshaw was an assignment. (Finley on Landlord and Tenant, p. 336; Wood on Landlord and Tenant, sec. 65; Irvine v. Scott, 85 Ky., 260.)

5. The doctrine of estoppel *in pais* applies with peculiar force in this case.

6. The option in this case is in effect a covenant running with the land, and as such inures to the benefit of the defendant holding the assignment. (Wilkinson v. Pettit, 47 Barb., 233; Tracy v. Albany & Co., 7 N. Y., 474; Demorest v. Willard, 8 Cowan, 210; Rosevolt v. Hopkins, 33 N. Y., 81; McClelland v. Rush, 24 Atl. Rep., 354; Taylor on Landlord and Tenant, secs. 436, 438.)

HUMPHREY AND DAVIE FOR APPELLEE.

1. The lease was for "the term of ten years," and not for a term of fifteen years, and the *sub*letting was only authorized for the ten years. (Thebaud v. First National Bank, 42 Indiana, 217; Renoud v. Dascom, 34 Connecticut, 512; 15 Illinois, 174; 6 Central Law Journal, 423.)

2. The option to renew for another "term of five years," was to renew for the *entire* premises, and the entire rental, and not for a *fragment* of the property and a fragment of the rental. (Wood on Landlord and Tenant, 2d Edition, vol. 2, pages 931, 935, 941, 949.)

3. There was no proof that Dr. Pope was *authorized* by the landlord Jones to promise or make a five-years' lease of this *fragment* of the lot, to Cook; and statements made by Dr. Pope to Cook, therefore, would not create a lease, or estoppel, as against Jones. (Abbott's Trial Evidence, 43; Wharton on Evidence, sec. 1183.)

4. Cook's own evidence, and his letter of January 13, 1893, showed that he knew Dr. Pope was not authorized to agree to make a lease of this fragment to Cook; and that he knew Dr. Pope had not in fact agreed to do so, but had merely "put him off," without a promise.

5. If Dr. Pope had been authorized by Jones to make a five-year lease of this fragment to Cook, and if he had promised to do so, it was *verbal* merely, and therefore void under the statute of frauds, and would not give any *possessory* right to Cook for any period of time. (Usher v. Flood, 83 Ky., 557; Ragsdale v. Lander, 80 Ky., 61; Fite v. Orr, 8 Ky. Law Rep., 349.)

6. The dicta in earlier cases in Kentucky which would fritter away the

statute of frauds by intimating that a tenant in possession under a
verbal lease for a term of more than a year could withhold *possession*
from the landlord, are corrected and explained in the case of Usher
v. Flood, 83 Ky., 557, and Caperton v. Stege, 91 Ky., 351.

7. The case of Caperton v. Stege, 91 Ky., 351, should govern this case in
holding that a tenant can not withhold *possession* after the term for
the purpose of removing his improvements, but has a *license* to re-
enter for the purpose of such removal for a reasonable time, if he
should have any right of removal (which Cook had not.)

8. The case of Irvine v. Scott, 85 Ky., 260, was a case of a *one*-year lease,
that is not in violation of the statute of frauds; and that case is differ-
ent from, and inapplicable to, the case at bar.

JUDGE HAZELRIGG DELIVERED THE OPINION OF THE COURT.

Samuel H. Jones and his son, Samuel H., Jr., were
the owners of a lot of ground in Louisville, situated in
the square bounded by Third, Chestnut, Fourth and
Walnut streets, its frontage on Fourth being about
one hundred and ninety feet, and extending back
some two hundred and fifty feet; the frontage on Wal-
nut was about thirty-three feet, with a depth of one
hundred and eighty feet.

Prior to the rental contract, out of which this con-
troversy grows, the premises fronting on Fourth street
were occupied by a number of tenants, who had built
their own improvements, under an arrangement by
which they paid a ground rent to their landlord, based
on the value of the lot occupied by them. The precise
terms of their rental contracts are not shown here, and
we do not know upon what conditions, if any, the ten-
ants might remove their improvements in the event
their leases were terminated.

We find the premises occupied by those who had
erected valuable improvements thereon, under an ar-
rangement, as we assume, which demanded some con-
sideration and protection at the hands of the landlord,

as a provision for their benefit was inserted in the lease we are about to consider. These prior leases were about to expire, and on May 5, 1881, the Jones' leased the entire premises to the Louisville Coffin Company for a term of ten years from and after January 1, 1883, with the privilege of renewal for a term of five years, upon the same conditions, at the option of the company.

The business needs of the company, as we suppose, not requiring the whole of the property, it secured the right to sublet any part of it, but the following stipulations were inserted in behalf of the Fourth street tenants: "And whereas, a portion of said ground, fronting on Fourth street, is occupied by divers persons; therefore, in order to protect their interests, said second parties (the Coffin Company) covenant to sublet to said persons, for a term not exceeding the term of this lease, the lots respectively occupied by them; and in estimating the rent to be charged to and paid by said subtenants to said second parties, the ground occupied by them shall be appraised as aforesaid, and as of the depth of two hundred and fifty feet, or to the east boundary of the ground hereby leased; and said subtenants shall pay three-fourths of six per cent. per annum of the value of the lots appraised as aforesaid, and upon the same terms and conditions as are reserved and made in this lease."

On the first of January, 1883, the Coffin Company, in pursuance of its covenant, did lease to Charles Godshaw, one of the Fourth street tenants, the premises occupied by him "for and during the term of

ten years from and after January 1, A. D., 1883, with option to the said Charles Godshaw to renew said lease for a term of five years, as specified in said lease to said Louisville Coffin Company, on the same terms and conditions as are specified in said lease to said Louisville Coffin Company aforesaid for subtenants."

On February 7, 1883, Godshaw, in consideration of the sum of thirteen hundred dollars, sold his house and all other improvements and appurtenances thereunto belonging, situated on the lot in question, to the appellant Cook, who took possession of the premises, and thereafter paid the ground rent to the company.

In 1884, the appellee, Sam. H. Jones, Jr., theretofore a minor, became of age and ratified the lease to the Coffin Company. His father died before this litigation began, and the son became the sole owner.

In 1888, the Coffin Company sold out its improvements on the property to the Hegan Mantel Company, known in the record also as Hegan Bros. The appellee joined in this contract, which was a transfer, not only of the improvements, but of the remainder of the Coffin Company's unexpired leasehold, "together with the privilege of renewal for five years as set out in the lease of 1881." All the tenants on the premises, including the Hegan Mantel Company, prior to January 1, 1895, the termination of the original lease, applied to Pope, agent of Jones, as well as to the Louisville Coffin Company, for a renewal of their leases for five years.

On December 12, 1892, the Coffin Company wrote to

Cook v. Jones.

Jones: "We notify you that we will not exercise our option to renew the same for a further period of five years, except the Hegan Bros. lease, concerning which there is a special obligation in case they desire a continuance."

On January 23, 1893, no contract of renewal having been executed, the appellee sought to oust the appellant by a writ of forcible detainer.

A judgment of restitution was obtained from a magistrate's court, which Cook traversed, and on a trial before a special judge of the Jefferson Circuit Court, a jury being waived, judgment was rendered for Cook, but a new trial was subsequently granted by the regular judge, and on a trial thereafter had before a jury, the court peremptorily instructed a finding for the appellee. From that judgment on that finding Cook appeals.

The rights of other Fourth street tenants appear to be dependent on the determination of this appeal, and the following map will explain their respective holdings:

190 feet.
Fourth street.

For the appellee it is contended that the Louisville Coffin Company alone had the right to exercise the option to renew or extend the lease, and it having declined to exercise it, the appellee was entitled to the possession of the premises; that even if, as contended by the appellant, Pope, as agent for Jones, had given assurances to the tenants that their leases would be renewed, yet he, Pope, had no authority to make an agreement to renew, and, in fact, made no such agreement or gave such assurances; that the Coffin Company alone had the right to remove improvements, and was to do that the last year of the lease, and all proof or showing as to the improvements erected and owned by these tenants was irrelevant to the issue, and properly excluded from consideration by the lower court; that under the lease there was but *one* right of renewal, and that was a right to renew for the *entire* property, and not for a fragment of it. "By no species of ingenious jugglery," say counsel, "can it be worked out that any subtenant had the right to renew for his own fragment of land only, and no subtenant has ever sought to renew for any thing else but his own fragment."

These contentions of counsel appear plausible, it seems to us, only upon a very strict and technical construction of the lease of the Coffin Company. It may be true that as the lessee might not elect to renew for a part of the premises, its assignees could not do so. But when the Coffin Company sold and transferred its entire interest in the premises to others, as was contemplated it might do under the lease, and which it might do without an express contract, its

right to exercise the option of renewal also passed by the sale and transfer, and it would seem strange if the assignees—representing the entire right of the Coffin Company—might not do what their assignor might do.

The rights of the landlord could be in nowise affected by the exercise of the option to renew, on the part of the assignees of the company, any more than if the option were exercised by the company itself. The right of renewal was one claimed by the assignees under their purchase of the leasehold from the company, and hence subordinate to the demands of the rental contract between the landlord and the company. This contract gave to the landlord "a lien for the rent on all buildings and improvements now on said ground or that may be erected thereon by said second party (Coffin . Company) or any sub-tenant, and all insurance held or to be held by said second party or said subtenants. And also a lien for said rent on this lease and leasehold hereof, and on the respective leases and leaseholds of said sub-tenants." Thus, while the contract of May 5, 1881, provided for a parceling out of the ground and a renting to different persons in severalty, there was no severance of the obligation on the part of the tenants and subtenants to their landlord. Each one's building, improvements, insurance, leasehold, &c., were liable to the landlord for the entire rent.

It is said, however, that no subtenant or assignee of the Coffin Company offered to renew for the entire premises, or undertook the obligation to pay the entire rent. This, we think, makes no difference. The legal rights of the landlord were fixed under

the contract, and when the subtenants demanded a renewal, the law of the contract imposed the obligation. The letter of the Coffin Company, written after it had sold out all interest in the leasehold, and no longer occupied any portion of the ground, could not affect the rights of its assignees. The landlord had ample notice of the sale and transfer made by its original tenant to these subtenants or assignees. He had joined in the sale to the Hegan Mantel Company, and knew of its right to renew, and Mr. Pope, his agent, is shown to have known of the claims of the other assignees in the spring of 1892.

The contracts of the company with the subtenants and with the Hegan Mantal Company were not mere sublettings. They were assignments of its entire right and interest in and to the leasehold. "The distinction between an assignment and a lease depends upon the quantity of interest that passes and not upon the extent of the premises transferred. When, therefore, the lessee of a house for seven years demises a part of it to another for the whole of his term, this is not an under-lease, but an assignment *pro tanto*." Wood's Landlord and Tenant, section 65, and Taylor's Landlord and Tenant, section 426.

If, however, the contract of May, 1881, is to be so strictly construed as that these assignees not being parties to it, are not entitled to demand a renewal of the landlord, though they all make the application, yet it is hardly to be denied that they could have required the Coffin Company to make such demand. This they might not be entitled to if they had been mere subtenants, but as assignees they clearly had

such right. They insist that they did not exercise it because of the assurances given them by the landlord through his agent as early as in the spring of 1892 that their leases would be promptly renewed. If such assurances were in fact given, we do not see how the landlord is to profit by his own wrong and obtain possession of his property by violating his pledges to renew the lease. The question is, then, were any such assurances given?

The trial judge was of the opinion that testimony on this question was incompetent, and we get the proof only in the form of an avowal of counsel while the witness was on the stand. The avowal is that the appellant had quite a number of interviews in the latter part of the spring and in the fall of 1892, on the subject of a renewal of his lease, with Dr. Pope, and insisted on knowing whether or not the extension of his lease would be made, because of the importance to him to provide a home and to sell his property, which he valued at five thousand dollars, and that Dr. Pope assured him that the lease would be extended, and that he need have no apprehension to the contrary, and to give himself no uneasiness. That the first time he received any information from Dr. Pope that the lease would not be renewed, was on the 7th day of January, 1893. By B. F. Alford also it was proposed to be shown that, at the solicitation of the appellant, he went to see Dr. Pope in the spring of 1892 about having the lease extended for five years, and Dr. Pope assured him that the lease would be extended, and for him to say to Dr. Cook he need be under no apprehension about it; that he reported

to Dr. Cook as directed by Dr. Pope that the lease would be renewed, and that he need have no apprehension and to give himself no uneasiness; that whether the lease was extended by the Coffin Company or not, Jones, the owner, would extend it for him for five years from January 1, 1893. The witness testified that he went to Dr. Pope as the agent of all the Fourth street tenants, and so informed him.

Dr. Pope testifies that, beginning about April and May, 1892, the appellant applied to him for a renewal of his lease, but that he never, at any time, told him or Alford that the lease would be renewed, or that he would advise Jones to renew it; that in fact he had no authority to renew the lease; that he gave all the tenants the stereotyped answer that he was in consultation with his attorneys.

We think the preponderance of the proof is that these assurances were given. Whether Dr. Pope had the authority to conclude the lease or execute the necessary writings is not material. It is evident that he was the owner's general agent in control of the property. He, in substance, so swears, and says he declined to furnish the address of Jones to the appellant, because he "had been requested by Mr. Jones to not allow any of his small fry to communicate with him as his agent;" he "wanted to stand between him and protect him." He consulted his attorneys as to what he should do under the leases of the Coffin Company and the Hegan Mantel Company, and took such steps as he was advised by the attorneys to take. We think Dr. Pope stood in the place of Jones in all the transactions leading up to the litigation,

Cook v. Jones.

and that his assurances and agreements that the leases would be renewed are to be given the same effect as if made by Jones himself.

The views we have expressed are also in accord at least with the spirit of the contract of 1881, in giving protection to the tenants in possession of the Fourth street improvements. We cannot believe that this long delay in giving an answer to the tenants and lulling them into a sense of security until after the termination of the case, was for the purpose of effecting a confiscation of their improvements or a sale of them to the land-owner at a ruinous sacrifice.

It is true that, prior to January 1, 1893, the agent appears to have consulted his attorneys on this subject, and that his doubts were not dissolved until after the leases were ended, when he notified Alford "*not to move the improvements as the owner claimed them as his own.*" Alford's reply was that "that was not business. It was robbery." And so it would have been.

In our opinion, the appellant is entitled to hold the premises under his exercise of the option provided for in the lease of 1881, and occupies the same relation to his landlord as the Coffin Company would have occupied had it exercised the option instead of selling it to another. The new trial should not have been granted.

The judgment of restitution is reversed, with directions to dismiss the proceeding.